20-3499 U.S.A. v. Bankasi Mr. Latkovich Yes, Your Honor. Good afternoon, and may it please the Court. This case against Halk Bank is unprecedented. It's the first time in our country's history in which the government has indicted and prosecuted what it concedes is a foreign sovereign. But this prosecution is barred by the plain text of Sections 1330 and 1604 of the Foreign Sovereign Immunities Act, which provides for broad sovereign immunity and then creates jurisdiction for a limited subset of civil actions. This reading is consistent with the common law codified by the FSIA, the law applied by our country's allies, and international law. The government's reading of the FSIA, however, would have this Court hold that Congress massively and silently expanded the application of the restricted theory to criminal cases against sovereign states, a step no other nation had taken at the time or has taken since. Alternatively, if the government is correct that the FSIA does not apply to criminal cases, then Halk Bank is immune under the common law. Either way, the judgment of the District Court should be reversed. Your Honor, let's start, as we must, with the plain text of the FSIA. Section 1604 provides broad immunity from jurisdiction. The government does not dispute that. Instead, naturally, this provision grants foreign states presumptive immunity from all jurisdiction, including criminal jurisdiction. In an attempt to avoid this plain language, the government tries to shift the focus to the jurisdictional portion of the FSIA, Section 1330A, which provides jurisdiction only for non-jury civil matters. In other words, the government claims that there is only immunity for sovereigns to the extent 1330A provides jurisdiction. But the government's reading of 1604 is refuted by the Supreme Court's decision in Amrata Hess and would overturn this court's decision in Mobile-Cerro. As for Amrata Hess, the court there held that the FSIA is the sole basis for obtaining jurisdiction over sovereigns in federal courts because Sections 1604 and 1330A work together and should be read together, with 1604 barring federal and state courts from exercising jurisdiction and with 1330A conferring limited jurisdiction over non-jury civil matters. And this court in Mobile-Cerro reinforced that decision, holding that even if an exception is satisfied, jurisdiction must still go through 1330A, not some other jurisdictional statute, in that case 22 U.S.C. 1650A. Moreover, the D.C. Circuit's decision in NRA Grand Jury Subpoena, upon which the government relies, makes many of the same mistakes as the Second Circuit opinion that the Supreme Court reversed in Amrata Hess. Indeed, Judge Kirsch's dissent there set out much of the reasoning adopted by the Supreme Court in its decision. More specifically, the Second Circuit's Amrata Hess opinion at 832 F2D 421, argued that the Alien Torch Statute, quote, means what it says, end quote, and was a clear jurisdictional grant, just like the D.C. Circuit said about 3231. But both opinions failed to read 1604 in context with 1330A. Finally, Your Honor, there's no credible argument that continuing to protect sovereigns from domestic criminal actions will somehow limit the executive branch's authority. Historically, courtrooms are not the forums or battlefields where sovereigns settle disputes. Instead, we see diplomatic actions, economic sanctions, or God forbid, the use of force. We don't see domestic criminal actions. In fact, we've never seen one, which would suggest the executive branch has managed quite well with its existing toolkit, including the prosecution of individuals involved. Put simply, the government has no canon of statutory interpretation, no common law basis, nor any international law basis to overcome the plain language of the FSIA, which provides for immunity in criminal matters. Now, Your Honor, turning to the commercial activities exception, the exceptions in Section 1605 codify the restrictive theory from common law for civil cases, but they don't apply to this case or in any criminal case. This reading is supported by the plain language of the statute. As we saw from this court in the Mobile Serial case, the FSIA exceptions cannot extend jurisdiction beyond what's provided in the FSIA, which the Supreme Court and this court have held as limited to Section 1330A. Next, despite the fact that the FSIA codified the common law, the government has not cited to a single pre-FSIA case applying the restrictive theory to criminal prosecutions. As the treatises explain, it has no application, which explains the dearth of case law. And, Your Honors, there's a practical effect here as well. Even the government concedes that under the common law, before the FSIA was implemented, sovereign states were immune from criminal jurisdiction at common law. Applying the FSIA exceptions in criminal cases would mean that Congress stripped common law immunity from sovereign states and did so with nary a whisper. Now, that would be an odd result standing alone, but it's even more unlikely given the fact that every other nation that has statutorily enacted the restrictive theory makes clear that it does not apply in criminal cases. Thus, application of the commercial activities exception here would violate precedent from the Supreme Court, this court, and conflict with common law and international law that the FSIA was designed to codify. Finally, Your Honors, if the FSIA does not apply, the common law governs Halk Bank's immunity claim. It's undisputed that at some point sovereigns were absolutely immune at common law, even in criminal cases. Until this case, the government has never indicted or prosecuted an admitted sovereign or instrumentality. Do you have a minute left? Thank you. The only examples the government can point to are two district court cases during the restrictive theory period when the government sought and failed to enforce grand jurisdiction. Similarly, there is no evidence that the adoption of the restrictive theory for civil cases means that it applies in criminal cases, nor does the government or the district court identify any evidence that international norms allow governments to exercise criminal jurisdiction over foreign states. In response to this lack of precedent, the government responds that it's the executive branch that makes the law here. But as Justice Thomas noted in his dissent in the Upper Skagit Indian Tribe case, the executive cannot unilaterally abrogate common law immunity principles. That power belongs to Congress alone. Currently, Halk Bank is immune under common law, and for these reasons, Your Honor, we would ask that the decision of the district court be reversed. I reserve the rest of my time, Your Honors, and I'm happy to answer any questions you may have. Thank you, Mr. Ratkovich. Judge Kears? No questions, thank you. Judge Bianco? Yes, thanks. I have a couple of questions. You keep referring to the common law, but in terms of instrumentalities of foreign states, the D.C. Circuit noted how unsettled the common law of criminal immunities for instrumentalities of foreign states. So I'm a little confused as to why you're relying on the common law to say that Congress silently immunized all instrumentalities of foreign states, no matter what their criminal conduct was, without mentioning that, notwithstanding Section 3231, which says that there's jurisdiction to prosecute for all offenses against the United States. Your Honor, I think there's two issues packed into there. The first is the use of all in 3231, all offenses. And I don't think that answers the question because I think all of the general jurisdictional statutes, including 1331, 1332, federal question and diversity questions, respectfully, include that same language of all offenses. Yet at the same time, we see that sovereign immunity trumps these general jurisdictional statutes. I'm just suggesting to you that Congress wouldn't have done this. It wasn't so clear that instrumentalities of foreign states were immunized under the common law. The Congress didn't even give a hint that they were addressing this in the FSIA. When the lead up to that, it was all about private plaintiffs and civil litigation. So and obviously, if you take, as the Supreme Court said in Moretta Hess, the immunity grant and the jurisdiction grant in tandem, it's pretty clear. The only focus is civil cases, right? I mean, you would concede that there's nothing in the statutory language that would suggest Congress's intent for this to be applied to criminal cases. Your Honor, I would concede that the legislative history does not include the word criminal. I was going to mention that, too. But, yeah, the word criminal is nowhere in the legislative history. But even in the statutory text, everything is about civil. Everything. Well, Your Honor, not everything. And that Section 1604 refers to all jurisdiction. Excuse me, refers to the jurisdiction of the courts, whereas Section 1338 only refers to the civil jurisdiction of the court. So I think that 1604 does refer to the criminal jurisdiction. As far as the instrument instrumentalities case, Your Honor, I think the government can't show a single case in which it has successfully overcome sovereign immunity for instrumentalities. The only two cases they cite, the In Re World Arrangements case and the In Re Grand Jury Investigation of Shipping Industry cases from the DDC in 1962 and 1960, respectfully, immunity clearly extended to those instrumentalities. The government was unable to enforce its grand jury subpoenas in either case, much less prosecute them. So I think the silence speaks to the protection that was afforded both sovereigns and instrumentalities, not the other way around. What about the removal provision? 1441D, if Congress did have criminal immunity in mind, why would they have provided for removal for civil actions that are initiated in state court and leave foreign states and instrumentalities of foreign states to fend for themselves in state court in criminal cases? If a New York state indicts Health Bank, it can't be removed. That's correct, Your Honor. I don't think there would have been any need to implement removal proceedings in the face of absolute immunity. The case could not go forward. So much like diplomats don't remove their cases, I believe that the same would be true for... You're missing the point of my question. If Congress is focused on this, they went to the trouble of passing a removal statute for civil cases because they didn't want Health Bank to have to go through a civil case in state court. Why would they not have done the same thing for criminal cases? It's a matter of congressional intent. Well, Your Honor, look, our focus is on the plain language of the statute and under the Lewis and Bostock cases, we think that controls. But again, to the extent Congress would have considered the issue, they were litigating against a common law background in which sovereigns were subject to absolute immunity in criminal law. There would have been no need to implement removal procedures when, in fact, no prosecution could go forward. My last question is, in the findings and declarations, why would they refer to litigants? Again, if this was supposed to be broader than civil liability and exceptions to that, why would they? Obviously, that's not usually a term you would associate with a criminal prosecution, right? Your Honor, I think even if a stray statement could contradict the plain terms of those separate provisions, I do think there are cases that would refer to the government as a litigant. And I would refer the court to United States v. Noble 762 F3D 509 at 527, where it says, quote, the government, like other litigants, can forfeit or waive an argument in criminal cases. I'd also refer the court to United States v. Stein 2006, Westlaw 1063295, again, quoting there at page 2, the government, like any other litigant, is prohibited from coercing witnesses to give false testimony, end quote. So I don't think that language there does the work that the government would have the court believe. All right. Thank you. Mr. Latkovich, this is Judge Cabranes. Your client is a commercial bank, is that right? My client does engage in some commercial bank transactions, correct, Your Honor? Well, no, it's a commercial bank. That's what it is. Does it engage in anything other than banking? It does, for example. Yes, Your Honor. For example, it collects taxes for the Turkish government in Turkey. In what sense does it do that? How does it do that? Turkish citizens can pay their tax bills through Halkbank, Your Honor. So it's just – in that respect, it could be anything. It could be the local candy store. You could pay it. But you wouldn't claim that the local candy store enjoyed special immunities just because it was a conduit for taxes. Your Honor, here I would think the immunity flows, in this particular case, from the ownership and control itself. But also it's not just – Halkbank doesn't just engage in, quote, commercial, end quote, applications. It has – it collects – like I said, it collects taxes on behalf of the government. It makes loans to shop owners and craftsmen, part of its original mandate that are backed by the Turkish treasury. And it operates government programs that are designed to encourage industrial areas, et cetera. In any event, you regard the bank as synonymous with the government of Turkey. Is that right? I believe under the definitions of the FSIA, yes, Your Honor. And would the officers of the bank enjoy diplomatic immunity in your view? I don't believe they would, Your Honor. I don't think that issue has come up. I'm just curious. Since the bank is synonymous with the government of Turkey in your view, I assume that the officers of the bank would be, in effect, state officials. Are they state officials? Your Honor, it's – I'm not sure that I've considered the issue. They could be, but I don't know that it would matter here because the FSIA does not cover state officials pursuant to the Sameter case. Now, several of these managers or executives of the bank have been indicted. Is that right? That is correct, Your Honor. And has anybody asserted a claim of diplomatic immunity or any other form of immunity that's ascribable to the government? Not that I'm aware of, Your Honor. I see. Okay. All right. So we'll hear from Mr. Kamaraju. Thank you, Your Honor. Good afternoon. May it please the court, it's an Arthur Kamaraju and I represent the United States. I'd like to actually pick up with a point that Judge Bianco raised, which I think sort of pulls the thread on the entire bank's argument. Everything about the FSIA speaks in civil terms. The statute speaks in civil terms. The legislative history speaks in civil terms. The case law interpreting the statute on which the bank relies speaks about civil issues. And yet the bank now suggests that this court should approve what is unprecedented, the application of the FSIA to defeat a criminal indictment, not against a nation state, but against an instrumentality of a foreign bank, a commercial bank, as Judge Cabradas noted. There is nothing in the statute that supports such a dramatic extension of sovereign immunity. And I noticed defense counsel in his argument said that their focus is on the plain language. So I'd like to pick up there because their focus on the plain language appears to speak entirely with Section 1604. They do not apply that same doctrine to Section 3231, which as Judge Bianco noted, explicitly provide subject matter jurisdiction for federal criminal indictments. They do not apply that to Section 1330, which contains no jurisdiction stripping language in it whatsoever. And they similarly do not apply even when discussing the exception. What the bank instead has offered is a sort of schizophrenic analytical framework by which this court should adopt a biopic focus on a few phrases in Section 1604 to the exclusion of the rest of the statute's language. But then when considering the exceptions, should more broadly review the text and structure of the statute. And the reason why the bank offers that type of disconnected analysis is because under any consistent reading of the SSIA, the bank's immunity claim must be disputed. Now, the bank has asserted that Section 3231 cannot provide a basis for jurisdiction and has argued that the Amoretta Hess decision supports that claim. We respectfully submit that Amoretta Hess, as the D.C. Circuit found, has no application. Principally, Section 3231 deals with a completely different field, criminal prosecution, and is located in a different title. Now, what Defense Counsel did not mention about Amoretta Hess is that the language with respect to implied repeals of jurisdictional statute is specifically tied to that, to Title 28. And similarly, with respect to this court's decision in Mobile, Serrano, that case held that a civil proceeding to enforce an arbitration award could not escape the reach of the SSIA. That distinction is critical. For decades, the Supreme Court and this court have held explicitly that the SSIA is the comprehensive set of legal provisions governing civil actions. The court has never extended it to criminal actions. It's specifically tied to civil actions. And so the import, and the D.C. Circuit noted this in Grand Jury Subpoena, in Amoretta Hess, what the court was then considering is, how does the SSIA interact with these other civil grants of subject matter jurisdiction? And if, in that case, the court had permitted the plaintiffs to bring a case under the ATS, you would have had a situation where precisely the evils that Congress sought to avoid through passage of the SSIA would have manifested itself again. Namely, that private litigants would be subject to the whims of foreign nation states lobbying the State Department to assert immunity on their behalf. That is simply not the problem when it comes to criminal prosecution, and you see that same doctrine play out in this court's decision in the ASA Corporation case cited in our brief. Just as with criminal prosecution, when the United States elects to perform a criminal orbiter action, it is the United States that can weigh, through its executive branch agencies, can weigh the appropriate balance of foreign policy issues to decide whether to proceed against the property of a foreign state or to indict a foreign instrumentality. Now, defense counsel spent a fair amount of time, and I think Judge Cabranes, you highlighted this, trying to equate the instrumentality of a foreign state with the foreign state itself. The SSIA does not support that interpretation. The SSIA specifically delineates the two, but more importantly, the common law with respect to foreign state instrumentality is not nearly as clear as the bank would have this court to believe. In fact, as the D.C. Circuit noted explicitly, it's a particularly muddy area of law, and thus it would be hard to swallow to use that court order. The concept that Congress would have, without even referencing it, destroyed the executive branch's ability to prosecute bad actors who commit that conduct to a foreign state instrumentality. There's nothing to support that interpretation, and the only argument that the bank can give this court as to why Congress might have taken such an unprecedented and dramatic step is this false reading of the status of sovereign immunity prior to the SSIA. From as far back as Schooner Exchange, and the court recognized this as unlimited, foreign sovereign immunity has been a matter of comedy and grace. The United States exercised that grace to impose absolute sovereign immunity for decades. In 1952, as this court's well aware, the executive branch shifted its practice, mainly, in fact, to be in line with a trend in international law to embrace what is now known as the restricted period. Nowhere in the Tate letter or in any of the State Department's rulings did they speak to the question of, we are retaining some form of absolute immunity with respect to criminal prosecution of foreign sovereign instrumentality. And quite frankly, the fact that those prosecutions are rare is not a testament to the fact that the executive did not have the power. We've cited cases in our brief where the executive did pursue criminal prosecution, but it is the fact that other mechanisms worked. The same types of diplomatic resolutions worked, but the fact that they worked is not a sign that the executive somehow lost the ability to pursue criminal prosecution. And the irony of that argument is, I think, fully demonstrated by this case. Sanctions are authorized by Congress and then are promulgated through regulations by the executive branch. Congress has then authorized the executive branch to enforce those sanctions through, among other things, criminal prosecution. But what the bank would have you believe is that because sanctions are one solution, that the United States is not permitted to see that through its final conclusion when, for example, you have a foreign bank that attempts to launder $1 billion. In fact, exceeds in laundering, excuse me, $1 billion of proceeds on behalf of one of the United States' foremost adversaries through the U.S. financial system, deceiving both the banks and U.S. government actors at the same time. This is precisely what Judge Bianco referred to, essentially a license for foreign instrumentalities. Excuse me, you have a minute left. Thank you. Any criminal approach. And I'd just like to touch quickly, Judge Bianco mentioned, why aren't any of these things, any of these references in statute? And defense counsel brought up diplomatic immunity. And we would commend the diplomatic immunity statute and regime to the court. Diplomatic immunity has been a foundational piece of this nation's history since 1790. It's a kind of international law. But the manner in which Congress has dealt with diplomatic immunity stands in stark contrast with how Congress purportedly dealt with, according to the bank, immunity from criminal action for foreign sovereigns. In particular, the current version of the diplomatic immunity statute was adopted in 1978, just two years after the FSIA. It's codified. In its codification, it retains discretion for the executive branch as to how to pursue or how to impose and monitor immunities. That's 22 U.S.C. 254C. It provides a mechanism by which those immunities can be asserted in court, not through jurisdiction. As the bank would have you believe the FSIA does, but rather through authorizing a motion to dismiss specifically in any action or proceeding, which again distinguishes the court's specificity, on the grounds of diplomatic immunity. And significantly, also requires that the State Department provide periodic reports to Congress whenever an action is dismissed on the grounds of diplomatic immunity. Which shows how seriously and how thoughtfully Congress approached the diplomatic immunity statute. What the bank would have this court believe is that Congress similarly wanted to immunize foreign sovereigns and their internal powers in particular, but did so without anything nearing that level of detail, thought, or phrase. With that, I'm happy to answer any questions. Thank you. Judge Kearse, any questions for the government? No questions. Thank you. Judge Bianco. Yes, thanks. I said one question. The government, you said just now that, you know, as the D.C. Circuit said, the common law is murky as it relates to instrumentalities of foreign states. But in your brief on page 32, you argued both before the FSIA's passage and since the United States has criminally prosecuted and served criminal process of commercial enterprises that are majority owned by foreign governments. And I guess when I looked at the cases you cited there, at least the pre-FSIA passage, that none of them fall into that category. The Southern District 1929 case is a civil antitrust case. The NRA investigation of world arrangements, 1952, the court rejected the government's attempt to serve a subpoena. And then the NRA grand jury investigation of the shipping industry in D.C. in 1960, the court reserved its view on whether sovereign immunity precluded the issuance of the subpoena. So as far as I can tell, the government hasn't successfully litigated this issue. I'm not even sure the government has tried prior to the passage of the FSIA to indict an instrumentality of a foreign state. I'm not suggesting that means it can't do it, but I don't think the government can fairly say that this has been established by some prior case. No, Your Honor. We're not suggesting that the issue has been settled by a prior case. Or even if the government has done this. Think about a case. Is there an example where the government has sought to do this? Well, so first of all, with respect to the cases that were originally cited in our brief, our point in citing those cases were, those are attempts by the government to serve a criminal process. So the bank's contention that the government has not even attempted to do this, which reflects the executive branch's understanding reportedly that it did not have the authority to do that, is incorrect. We did cite the Estado case, which is post-FSIA, in which the government did seek to prosecute, though eventually it was through a deferred prosecution agreement, a foreign instrumentality. But our argument is not that it has been conclusively settled. Our argument is, precisely as the Chief Justice said, and for the same reason, that it's too muddy for us to be able to say that Congress imported that type of common law understanding into the statute. The executive branch certainly has not interpreted its authority that way. In fact, in the legislative history of the statute, the executive branch weighed in and focused extensively on private litigants. But it would also support the idea that it wasn't on Congress's mind when they passed the FSIA because it wasn't an issue. Absolutely, Your Honor. As you pointed out before, all of the legislative history that focuses exclusively on private litigants, and even the principles animating those concerns, the due process concerns of private litigants, are not implicated in the criminal prosecution. Similarly, the foreign policy concerns that may be raised by private litigation do not exist when the executive branch is bringing its own prosecution. That is a principle that has been held in the Pasquitino case, in Jorge's case, or Fidel's case, in this court's jurisprudence in Ossa. I think all of this goes to show, as the Samantar case held with respect to foreign official immunity, that criminal prosecutions were just not the problem that Congress was trying to address. And to now seek to take that statute and expand it into that sphere would recap. All right. Thank you. Mr. Camaraggio, Judge Cabranes here. Let me go back to a question that I put to opposing counsel about the officers of the bank. Do you have any view on whether the government has regarded those officers as enjoying diplomatic immunity or any other kind of immunity associated with a foreign sovereign? Yes, Your Honor. So it is our position that those officers do not enjoy diplomatic immunity. And we have a very real example in that, as Your Honor pointed out, we've indicted multiple foreign officers at the bank and, in fact, prosecuted Hakan Attila, who was the head of international banking for Hulk Bank, with respect to the scheme alleged in the Hulk Bank indictment. And that, during the entirety of that prosecution, Mr. Attila did not raise diplomatic immunity. He did not raise it before the trial court. He did not raise it during the Second Circuit proceedings. Ultimately, the Second Circuit affirmed, this court affirmed, Mr. Attila's conviction for participating in the very same scheme that Hulk Bank is now charging. And the government of Turkey did not, in any sense, express a view in connection with his prosecution? The government of Turkey did not file anything, either with the trial court or with the Court of Appeals, raising any type of... All right. Let me go on to some of the questions that Judge Bianco raised with you. We heard the defendant's counsel's opening argument, and I may have misunderstood his argument, but as I understood it, he was claiming that this prosecution is unprecedented or virtually unprecedented. Is that a fair characterization of his view? Well, I think the way he stated it, as I understood it, was that this is an unprecedented indictment of a foreign state. And whether that would be true, if it were to be unprecedented to indict a foreign state, it is not fair to say that it is unprecedented to criminally charge the instrumentality of a foreign state. Wow. And can you give us some indication of what some recent... This goes to Judge Bianco's question. Some of the cases you cited, page 32 of your brief, are somewhat antique. But are there others that you bring to our attention that come to mind as involving something of this sort? I noticed at page 29, a citation to the Tenth Circuit case involving the Central Bank of Nigeria. Is that an example of the government prosecuting an instrumentality of a sovereign state? So that, Your Honor, that's the Keller case. That is actually a civil RICO case, so it was not a government prosecution. Currently pending before the Ninth Circuit, however, is the Penn Gang case, which is an example of the government pursuing criminal charges against state-owned corporations. I'd also notice we indicated before the Statoil case that was a deterrent prosecution, but was pursuant to criminal information filed by the government. So there are examples in which the government has pursued that. All right. Let me ask you to go off on a different concern. As you recall, there was an order of December 23, 2020, by a motions panel of our court, which stayed the proceedings in the district court. At that point, it appears from the record, the district court envisaged a jury trial to begin on May 3, 2021. Assuming for the argument only that we vacate that stay order, is the government in fact prepared to proceed to trial in this case? Well, Your Honor, in the light of this stay, there were no pre-trial motions filed, and there were other—this obviously occurred as our—those deadlines have occurred. There have been no pre-trial motions filed, no request to charge, some of the typical pre-trial filing that you can expect. So we're not in a position at this moment to try the case without those filings. But are you in a position to tell us whether you would proceed with the prosecution in the normal course if that December 23 order was vacated? Yes, Your Honor. The situation is complicated a little bit because of the way trials are currently being scheduled due to the COVID pandemic. And so, pursuant to the standing order, there's a procedure through which trial dates are assigned, which I believe you know of. And so, we don't know when the district court would be able to put in for a trial date and whether we would get it. So, from that perspective, I think the trial dates for May have already been assigned. So, it seems clear that we will not have that trial date, but we don't know when we would be set down for trial. All right. Now, Mr. Latkovich has reserved three minutes, so we'll turn to him now. Yes, Your Honor. A few responses. First, starting with Section 3231 and its reference to all offenses. That just can't answer the question, because even the government concedes that foreign states are immune at the common law. And that means that all offenses does not mean all offenses when it comes to SOPRs. As far as the questions about a comprehensive scheme, the government says this has never been applied to criminal cases. That's because there haven't been any criminal cases. But nothing in the Act or in the Amarada Hess decision limits its analysis to civil cases. In fact, at no point during the argument did the government explain why 1604 does not reference or is not cabined merely to civil jurisdiction, as opposed to 1330A. In terms of comedy and grace, Your Honor, I think sovereign immunity comes at the comedy and grace of the United States, not of the executive branch. The executive is not a law unto of itself. Chief Justice Marshall didn't rely merely on the executive's suggestion of immunity in the Skinner Exchange. He looked at international law and common law. And the government explicitly admitted this in the Tate Letter, where it conceded that a shift in policy by the executive cannot control the courts. That means that sovereign immunity applies unless and until Congress unmistakably provides jurisdiction that trumps such immunity. And it has not done so here. Finally, regarding instrumentalities, Your Honor, despite the government's attempt to characterize criminal prosecutions as, quote, rare, unquote, they just don't exist. Other than the government's cases they cite, none of which are actual prosecutions, their best site is a law review article that says it's theoretically possible to indict instrumentalities, but doesn't actually include any indictments. And, Your Honor, the government's reference to the Pan Gang case is quite confusing because there the government disputes that the Pan Gang entities were instrumentalities of the Chinese government at all, a subject that was of much discussion at the Ninth Circuit. But I will say this, Your Honor. I think to the extent this court believes there's any uncertainty at common law about whether it can indict instrumentalities, we don't think it does. That confusion works against the government. There is no dispute that going back to the Schooner Exchange, sovereigns and their instrumentalities were absolutely immune from criminal jurisdiction. And the government can't cite a single case that would change that common law. Absent a change in common law, only Congress can change the jurisdiction of the courts, and we would submit that instrumentalities, just like sovereign states themselves, are immune from criminal prosecution. Thank you, Your Honor. Thank you. Judge Kearse, any questions? No questions. Thank you. Judge Bianco, any other questions? No, thanks, Justice Garza. Okay, we'll reserve the decision, and we are adjourned. Court is adjourned.